IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA


|                                    |     |                        |
|------------------------------------|-----|------------------------|
| **UNITED STATES OF AMERICA,**      | )   |                        |
|                                    | )   |                        |
|                                    | )   |                        |
|                                    | )   |                        |
| v.                                 | )   | Criminal No. 09-276    |
|                                    | )   |                        |
| **STEVEN MENSAH-YAWSON,**          | )   |                        |
|                                    | )   |                        |
| Defendant.                         | )   |                        |
|                                    | )   |                        |
|                                    | )   |                        |

## OPINION

**CONTI, Chief District Judge.**

### I. Introduction

Pending before the court[1] is a petition for a writ of coram nobis (ECF No. 250) filed by defendant Steven Mensah-Yawson ("Mensah-Yawson" or "defendant") to challenge his conviction and sentence for conspiracy to manufacture, possess, and utter counterfeit checks in violation of 18 U.S.C. § 371. After consideration of the submissions of the parties, the court will deny defendant's writ of coram nobis motion for the reasons set forth herein.

### II. Background

On September 15, 2009, defendant was indicted with Stacy Nicholas ("Nicholas"), James Greer ("Greer"), and Daniel Poole ("Poole") for conspiracy to manufacture, possess, and utter counterfeit checks in violation of 18 U.S.C § 371. (ECF No. 1.) On December 14, 2010, a jury found defendant guilty of conspiracy to manufacture, possess and utter counterfeit checks.

---

[1] The Honorable Gary L. Lancaster presided over the trial and post-trial matters in the above-captioned case. Judge Lancaster passed away on April 24, 2013. On September 20, 2013, the above-captioned case was reassigned to the undersigned judge.

(ECF No. 161.) On January 7, 2011, the court sentenced defendant to time served, a term of supervised release of two years, and restitution in the amount of $43,645.98. (ECF Nos. 172, 177.) On January 13, 2011, defendant filed a notice of appeal with the Third Circuit Court of Appeals. (ECF No. 181.)[2] The court of appeals affirmed. United States v. Mensah-Yawson, 489 F. A'ppx 606 (3d Cir. 2012).

On November 5, 2012, defendant filed a petition under 28 U.S.C. § 2255 to vacate his conviction and sentence. (ECF No. 236 at 13.) Defendant raised three arguments in his § 2255 motion: (1) the indictment should be dismissed because this court lacked subject-matter jurisdiction; (2) this court erred in calculating the total loss attributed to the defendant; and (3) defendant's counsel, Sally Frick ("Frick") was ineffective. (ECF No. 236 at 5-7.) On March 11, 2013, the court denied defendant's § 2255 motion and a certificate of appealability was not issued. (ECF No. 244 at 15.)

On September 13, 2013, defendant filed a writ of coram nobis with the court seeking an evidentiary hearing "to determine all relief sought and any other relief that the court deem just and proper." (ECF No. 250 at 22.)[3] On October 22, 2013, the government filed a response in opposition to defendant's motion for writ of coram nobis. (ECF No. 258.) On November 25, 2013, defendant filed a reply to the government's response. (ECF No. 260.)

## III. Legal Standard

---

[2] Defendant on appeal to the Third Circuit Court of Appeals argued that his right to a speedy trial pursuant to the Speedy Trial Act ("STA"), 18 U.S.C. §§ 3161-3174, and the Sixth Amendment to the United States were violated. The court of appeals held that Mensah-Yawson waived his rights under the STA because he did not file pretrial motions in a timely matter, and, even if he did not waive his rights, he did not satisfy the requirements of the STA. (ECF No. 234 at 6-7.)

[3] Due to the number of grammatical errors in defendant's submissions to the court, the court will not indicate each error when quoting from defendant's submissions.

A federal court may hear petitions of error coram nobis (the "writ of coram nobis") as authorized by the All Writs Act, 28 U.S.C. § 1651(a). United States v. Morgan, 346 U.S. 502, 506 (1954). A writ of coram nobis is a post-conviction remedy sought after a defendant has served his or her sentence and been released from federal custody. United States v. Babalola, 248 F. App'x 409, 412 (3d Cir. 2007). The writ of coram nobis is an "infrequent and extraordinary remedy" and relief is granted only when a defendant establishes that there was a fundamental error rendering the proceeding irregular and invalid. Babalola, 248 F. App'x at 411. A defendant has the burden to prove that his or her conviction is invalid. Id. at 412. "Earlier proceedings are presumptively correct and the petitioner bears the burden to show otherwise." United States v. Stoneman, 870 F.2d 102, 106 (3d Cir. 1989). The Third Circuit Court of Appeals has instructed:

> "The interest in finality of judgments dictates that the standard for a successful collateral attack on a conviction be more stringent than the standard applicable on a direct appeal." Gross, 614 F.2d at 368. It is even more stringent than that on a petitioner seeking habeas corpus relief under § 2255. See Osser, 864 F.2d at 1060-61; United States v. Keogh, 391 F.2d 138, 148 (2d Cir.1968) (unlike habeas, where part of sentence remained unserved, no opportunity or incentive in coram nobis setting to retry defendant using newly discovered evidence where sentence already served).

Id.

A fundamental error may be an assertion of an error that resulted in a conviction for conduct not constituting a crime. United States v. Foster, 236 F. App'x 758, 759 (3d Cir. 2007). The Third Circuit Court of Appeals has held that ineffective assistance of counsel and deprivation of counsel constitute fundamental errors that can be remedied by a coram nobis petition. Babalola, 248 F. App'x at 412 (citing United States v. Rad-O-Lite of Phila, 612 F.2d 740, 744 (3d Cir. 1979)). Technical errors, such as flawed jury instructions, which are usually remedied by a new trial, are not fundamental errors. Stoneman, 870 F.2d at 108.

A defendant must establish a valid claim in order to justify relief by writ of coram nobis. Babalola, 248 F. App'x at 414. In order for the defendant to receive an evidentiary hearing in a coram nobis case he or she must "successfully establish a ground for a claim of relief." United States v. Dwumaah, Crim. Action No. 05-157, 2012 WL 3597174 (M.D. Pa. Aug. 20, 2012) (awarding an evidentiary hearing for defendant's ineffective assistance of counsel claims). If another remedy is currently available, such as an appeal or habeas corpus, or the error does not produce a complete miscarriage of justice, then the error is not fundamental, and a writ of coram nobis cannot be issued. Stoneman, 870 F.2d at 108.

In addition to showing that there was a fundamental error the defendant must also satisfy three other threshold conditions: "(1) the defendant is suffering from continuing consequences of the allegedly invalid conviction; (2) there was no remedy for the defect available at the time of trial; and (3) 'sound reasons' exist for failing to seek relief earlier." Babalola, 248 F. App'x at 412 (quoting Stoneman, 870 F.2d at 106).

With respect to the first condition, i.e. the defendant is suffering from continuing consequences of the invalid conviction, subsequent convictions that lead to civil rights being affected can be considered a continuing consequence that would be remedied by the writ of coram nobis. Morgan, 346 U.S at 512-13.

The sound reason standard of review is stricter than that of a § 2255 motion. Mendoza v. United States, 690 F.3d 157, 159 (3d Cir. 2012), cert denied, 133 S. Ct. 1456 (2013). A defendant must provide justification for any delay in seeking relief for any claims raised in a coram nobis petition. Babalola, 248 F. App'x at 412. An unsettled law is not justification for an undue delay in seeking relief. Mendoza, 690 F.3d at 160. A defendant is precluded from raising an issue in a writ of coram nobis if he or she had an earlier opportunity to raise the issue in a §

2255 motion.[4] <u>United States v. Baptiste</u>, 223 F.3d 188, 190 (3d Cir. 2000). The writ of coram

nobis cannot be sought simply because the defendant could not meet the standards of a second or

successive motion under § 2255. <u>United States v. Rhines</u>, 640 F.3d 69, 72 (3d Cir. 2011).

## IV.  Discussion

Defendant, who is not a citizen of the United States and may be subject to deportation by

reason of the conviction at issue, argues that he is entitled to coram nobis relief based upon a

number of allegedly fundamental errors that occurred during trial or on appeal to the Third

Circuit Court of Appeals. Each of defendant's arguments will be addressed below.

### A.  Ineffective Assistance of Counsel

#### 1.  Sound Reasons

In defendant's writ of coram nobis, defendant asserts Frick was ineffective for several

reasons. With respect to whether defendant asserted "sound reasons" for failing to earlier seek

relief, defendant sets forth two arguments, neither of which have any merit, that apply to all his

ineffective assistance of counsel claims. Defendant argues that he could not raise his ineffective

assistance of counsel claims earlier because Frick, his trial counsel, represented him on appeal

and would not herself raise claims of ineffective assistance of counsel. This argument does not

consider that defendant could have raised his claims of ineffective assistance of counsel in his §

2255 motion, which was filed after Frick represented him on appeal; indeed, defendant raised

*some* of his ineffective assistance of counsel claims in his § 2255 motion. According to

_____

[4] The government argues defendant's "coram nobis Petition cannot be construed as a successive
habeas petition under § 2255 because it has not been certified by the Third Circuit as is required
for second or successive habeas petitioners, and he is not in custody on the challenged
conviction. Likewise, his Petition cannot be construed as a habeas petitioner under §2241
because he does not meet the custody requirement and is not challenging the execution of his
sentence." (ECF No. 258 at 14.) Defendant argues that his petition for coram nobis relief is not a
motion for reconsideration of his § 2255 motion or a successive § 2255 motion.  (ECF No. 260 at
2-3.) The court will, therefore, analyze defendant's motion as a coram nobis petition.

defendant, because he raised some of the ineffective assistance of counsel issues in the § 2255 motion, he may present his other ineffective assistance of counsel claims in a writ of coram nobis. To the contrary, a defendant is precluded from raising an issue in a writ of coram nobis if he or she had an earlier opportunity to raise the issue in a § 2255 motion. Baptiste, 223 F.3d at 190. A defendant must provide justification for any delay in seeking relief for any claims raised in a coram nobis petition. Babalola, 248 F. App'x at 412. Defendant did not provide sound reasons for failing earlier to seek relief for his claims of ineffective assistance of counsel. For that reason, defendant's coram nobis petition with respect to those claims will be denied. In any event and as detailed below, however, defendant's claims for ineffective assistance of counsel are meritless.

### 2. Fundamental Error Analysis

To support a claim that "counsel's assistance was so defective as to require reversal of conviction," Strickland v. Washington, 466 U.S. 668, 687 (1984), a petitioner must make two showings. "[A] habeas petitioner claiming a deprivation of his or her Sixth Amendment right to effective assistance of counsel must show that: (1) counsel's performance was deficient; and (2) counsel's deficient performance caused the petitioner prejudice." Ross v. Dist. Att'y of the Cnty. of Allegh., 672 F.3d 198, 210 (3d Cir. 2012) (citing Strickland, 466 U.S. at 687). "To show deficient performance, 'a person challenging a conviction must show that counsel's representation fell below an objective standard of reasonableness…. The challenger's burden is to show that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment.'" Ross, 672 F.3d at 210 (quoting Harrington v. Richter, 131 S.Ct. 770, 787 (2011)). "'With respect to prejudice, a challenger must demonstrate 'a reasonable probability that, but for counsel's unprofessional errors, the result of

the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" Ross, 672 F.3d at 210 (quoting Richter, 131 S.Ct. at 787). In other words, petitioner must show that there is a reasonable probability that his counsel's errors resulted in his conviction. See Glover v. United States, 531 U.S. 198, 203 (2001).

As both of these components must be demonstrated to support a claim of ineffective assistance of counsel, the absence of one negates the need to address the other. The United States Court of Appeals for the Third Circuit has directed district courts to address the prejudice prong of the analysis first. See McAleese v. Mazurkiewicz, 1 F.3d 159, 170 (3d Cir. 1993), cert. denied, 510 U.S. 1028 (1993) ("Indeed, this Court has read Strickland as requiring the courts to decide first whether the assumed deficient conduct of counsel prejudiced the defendant.") (internal quotations and citations omitted). The court of appeals in McAleese quoted the Court in Strickland as follows:

> "[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. The object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed."

McAleese, 1 F.3d at 171 (quoting Strickland, 466 U.S. at 697).

With respect to the deficient representation prong, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." Strickland, 466 U.S. at 690. "Because advocacy is an art and not a science, and because the adversary system requires deference to counsel's informed decisions, strategic choices must be respected . . . if they are based on professional judgment." Strickland, 466 U.S. at 681. "The Supreme Court directs that our 'scrutiny of counsel's performance must be highly deferential' to

avoid holding counsel incompetent because of reasonable strategic or tactical judgments which, with the benefit of tactical hindsight, might prove not to have best served his client's interests." United States v. Loughery, 908 F.2d 1014, 1018 (D.C. Cir. 1990) (quoting Strickland, 466 U.S. at 689).

> **a.** **Frick did not "move the court to strike" the evidence with respect to the check printer and ink analysis**

Defendant argues that "his guilty verdict arose substantially on the evidence of checks presented to the jury…[that were] found in [a] check printer as well as vague images of checks found in [a] laptop computer[,]" both of which were recovered from the home of defendant's ex-girlfriend, Ericka Thomas ("Thomas"). (ECF No. 250 at 10.) According to defendant, there was insufficient evidence to establish the counterfeit checks were printed from the check printer found in Thomas' home and that the laptop computer belonged to defendant. (Id. at 9-10.)

During defendant's trial, four individuals testified about defendant's involvement in the conspiracy. Robert Opat ("Opat"), one of the government's witnesses, testified that he met defendant through his roommate, and defendant asked Opat to cash a counterfeit check for him. (ECF No. 194 at 328-31.) Opat agreed originally to cash the counterfeit check, but later refused to participate and did not cash the counterfeit check for defendant. (Id. at 330-34.)

A special agent testified that:

- the day after defendant was arrested, the special agent went to Thomas' home to look for the check printer and laptop computer used to make and print counterfeit checks (id. at 247);

- Thomas led the special agent to a bedroom in which she last saw defendant use his computer (id. at 248);

- the special agent found in a closet in the bedroom a laptop computer and check printer (id.);

- the check printer contained black VersaInk and was stored with a bag from G7 Productivity Systems ("G7"), which contained an additional two cartridges of black VersaInk (id. at 293-94); and

- G7 sells check printers and ink (id.)

Thomas testified that defendant brought the laptop computer to her home one or two weeks prior to the special agent's visit. (Id. at 183.)

A forensic expert testified that a search conducted of the laptop computer found in Thomas' home, pursuant to a search warrant revealed:

- there was a check-making program on the laptop;

- in February 2009, files—some of which included bank account numbers for victims of defendant's crimes—were deleted from the check-making program (id. at 208-18);

- the names of defendant's co-conspirators and Opat were found on the laptop computer (id. 211-14); and

- email addresses, bank accounts, and a Facebook account (which were all in defendant's name), photographs of defendant's son, and files related to defendant's business were found on the laptop computer (id. at 174-78, 214-25.)

Representatives from the victims of defendant's conspiracy identified the payroll checks involved in the conspiracy and testified they were counterfeit. (Id. at 42-54, 85-91.)

A representative from G7 testified that:

- defendant had an account with the company and previously on five different occasions placed orders for check-making ink (ECF No. 194 at 144-64);

- on a date after defendant learned about the criminal investigation into his conspiracy, he contacted G7 and asked the company to erase his name and account from its records; (id. at 164-65); and

- the check printer found in Thomas' home was ordered from G7 by an individual other than defendant, but the individual refused to pay G7 for the printer because she did not order the check printer and suspected someone made an unauthorized use of her credit card to purchase it (id. at 167-69).

As defendant points out, evidence was presented to the jury that the government was unable to prove by a forensic test whether the ink found in the check printer was the same ink used on the counterfeit checks. (ECF No. 195 at 135.) Defendant argues that on that basis, Frick's performance was deficient because she did not move to strike all evidence of the counterfeit checks submitted to the jury, and he was prejudiced by her deficient performance because "his guilty verdict arose substantially on the evidence of checks presented to the jury," the ink found in the check printer, and "vague images of checks found in th[e] laptop computer." (ECF No. 250 at 9.)

To prove Frick's alleged deficient performance, i.e., failing to move to strike all evidence of the counterfeit checks based upon the inconclusive forensic analysis of the ink used to print the checks, defendant must show that but for Frick failing to make the objection, the result of the proceeding would have been different. Defendant failed to make such a showing in this case because if Frick had objected to the introduction of the counterfeit checks into evidence, the objection would have been denied. Although the forensic test of the ink used to print the counterfeit checks was inconclusive, the evidence presented by the government circumstantially proved defendant printed the counterfeit checks. The government presented evidence to the jury that:

- individuals testified that they cashed counterfeit checks with defendant and shared the proceeds with him;

- Opat testified defendant asked him to cash a counterfeit check;

- Thomas saw defendant using his laptop computer in a bedroom in her home;

- a laptop computer containing email addresses, bank accounts, and a Facebook account (all in defendant's name), photographs of defendant's son, files related to defendant's business, bank account numbers of the victims of defendant's offense, images of checks, and the names of defendant's co-conspirators, and Opat, were found in a closet inside the bedroom in Thomas' home;

- a check printer and check printing ink were found with the laptop in the closet inside the bedroom in Thomas' home; and

- defendant purchased check printing ink from G7.

In light of the foregoing evidence, sufficient evidence was presented to the jury for it to find that the counterfeit checks were printed on the check printer found in Thomas's home. There was no basis upon which Frick could have objected to the introduction of the counterfeit checks. Although the forensic test was inconclusive, meaning it could not positively identify that the checks were printed from the check printer found in Thomas' home, there was no evidence presented to the jury conclusively indicating the checks were *not* printed from the check printer found in Thomas' home. Under those circumstances, and in light of the other evidence presented with respect to defendant's extensive involvement in the conspiracy, defendant was not prejudiced by Frick's failure to "move to strike" the evidence of the counterfeit checks.

Defendant argues, however, that there was insufficient evidence to prove that the laptop computer found in Thomas' home belonged to him. Defendant in his writ of coram nobis argues:

> [The government] failed to establish a clear and convincing evidence that laptop actually belongs to the petitioner. His child's mother who testified during trial stated that petitioner brought that laptop to her house months before it seized by investigated. But she also testified that she was not sure whom the laptop belonged to because when petitioner dropped-off that laptop, he gave her an address in Minnesota to mail it through federal express to the owner. Most importantly record indicates that investigator stated in their report that there was evidence that some checks were printed in Minnesota. The government witness from the company that sold the check printer testified that the check printer was purchased and shipped to a Minnesota address.

(ECF No. 250 at 10.) Contrary to defendant's argument, Thomas actually testified at trial that:

- in late January 2009, two agents came to her home (ECF No. 194 at 182);

- the agents informed her defendant was arrested and evidence of the crime may be inside her home, i.e., they were looking for a computer they believed was inside her home (id. at 182-83);

- she told the agents that defendant brought a computer to her home one or two weeks prior to the agents' visit, and she remembered seeing defendant on the computer in her home (id. at 183-84);

- she previously saw defendant use the laptop computer when defendant and she were in college (id. at 188);

- she took the agents to the last place she saw defendant use the computer, a bedroom in her home (id. at 184);

- there was only a loveseat in the bedroom, and she last remembered seeing the laptop computer on the loveseat, but it was no longer there (id.);

- the agents looked inside a closet in the bedroom and found the laptop computer and a printer (id.); and

- she turned the laptop computer, printer, and other items over to the agents. (id. at 185, 189).

Thomas did not testify that defendant brought the laptop computer to her home "months" before the agents' visit or that she did not know to whom the laptop computer belonged. Thomas' testimony was sufficient to establish that—at the very least—defendant had access to the computer and used it on more than one occasion. The government presented evidence that personal identifiers of defendant's were on the computer such as email addresses and banks accounts in his name and pictures of his son with Thomas. Sufficient evidence was presented to the jury for it to find that defendant had access to the laptop and used it on more than one occasion. Defendant, therefore, was not prejudiced by Frick's failure to object to evidence with respect to the laptop or the counterfeit checks because there was no basis upon which to make such an objection. Under those circumstances, defendant failed to show a fundamental error occurred warranting coram nobis relief. Defendant's petition will be denied with respect to these issues.

### b.    Frick did not "mov[e] the court to strike out" the testimony of Robert Opat[5]

Defendant argues that Frick failed to "mov[e] the court to strike out" the entire testimony

of Opat. (ECF No. 250 at 16.) Defendant explains:

> Opat testified to the jury that he had know petitioner for a while as a close friend,
> he also testified that on one occasion he had a meeting of the minds with the
> petitioner in other words conspired with him to attempt to negotiate and
> counterfeit check at a Wal-mart location but he refused....Before petitioner's
> counsel begun her cross-examination, the petitioner quickly asserted that the had
> as a fact never seen or even met Mr. Opat ever before that instant moment.
> Petitioner was furious failing to recognized that prosecution would introduced a
> sworn in witness under oath knowingly and intelligently to commit perjury. The
> prosecution literally committed perjury and coerced a witness to identify
> petitioner wrongfully. Further, petition counsel stated that " the Government pays
> people sometimes to testify" petitioner counsel cross-examine Mr. Opat whom
> admitted in court that he was intoxicated of marijuana when petitioner allegedly
> coerced his into cashing a counterfeit check. In spite, petitioner assertion that he
> never seen or even met Mr. Opat, and his admittance in the court law that he was

---

[5] Defendant argues that with respect to this issue and whether he has sound reasons for failing to
earlier seek relief:

> At the time the 2255 was filed, there was not enough evidence to conclude that
> one of the Government witnesses Robert Opat who testified during trial was
> willing to confessed that indeed he had no knowledge of the petitioner therefore
> he lied under oath when he was coerced by the agent Raden to testify that he had
> "meeting of the minds" with petitioner.

(ECF No. 260 at 7.) This argument contradicts defendant's arguments that Frick's performance
was deficient for failing to move to strike Opat's testimony. If the evidence forming the basis of
excluding Opat's testimony did not exist at the time of trial, Frick's performance could not have
been deficient for failing to object to Opat's testimony.

Defendant also argues that he did not assert his claim for ineffective assistance of counsel
with respect to Frick failing to address the government's alleged commission of perjury with
respect to Opat's testimony because of a "pending investigation with the Office of Professional
responsibility" of the Department of Justice ("DOJ"). (Id. at 17.) Defendant did not explain why
he was unable to raise his ineffective assistance of counsel claim with respect to this issue in his
§ 2255 motion in light of the pending investigation. Defendant even concedes the DOJ refrained
from investigating the matter because it was under the review of the Court of Appeals of the
Third Circuit.

Even if the foregoing arguments were sufficient to show that defendant had sound
reasons for failing to earlier seek relief, for the reasons set forth above, his ineffective assistance
of counsel claim with respect to Opat's testimony is meritless because defendant cannot show
that but for Frick's allegedly deficiency, there is a reasonable probability the outcome of the
proceeding would be different.

intoxicated, counsel still failure to challenge the courts adversarial system moving the court to strike out his entire testimony.

(ECF No. 250 at 16.)

Opat testified that:

− he knew defendant through his roommate, and defendant came to their apartment and asked Opat to cash a fake check (ECF No. 194 at 73-74);

− he provided defendant with his name and other identifying information (id. at 74-75);

− defendant left the apartment, made a check for $900 from a company not located in Pennsylvania, and presented it to Opat (id. at 75, 76, 82);

− defendant instructed Opat that he would not get in trouble for cashing the check, and that Opat would receive $300 for cashing the check (id. at 75-76);

− defendant attempted to persuade Opat to cash the check (id. at 76);

− defendant and Opat went to Wal-Mart to cash the check because Opat did not have a bank account (id. at 77);

− he knew what they were doing was wrong and eventually told defendant that he would not cash the check (id.)

− he was smoking marijuana before defendant arrived at the apartment (id. at 80); and

− at the time defendant asked him to cash the fake check, he regularly smoked marijuana and at the time he testified, he smoked marijuana on occasion (id. at 81).

Frick on cross-examination asked Opat about smoking marijuana the day defendant asked him to cash the fake check, and sought a jury instruction with respect to the effect of drug use on the testimony of a witness. (ECF No. 194 at 80-81, 89-90.) The court instructed the jury as follows:

The evidence was also introduced during the trial that Robert Opat was using drugs when events occurred that were involved in this case. There's nothing improper about calling such a witness to testify about events within his personal knowledge.

14

On the other hand, his testimony must be considered with care and caution. The testimony of a witness who was under the influence of drugs may be less believable because of the effect the drugs may have had on his ability to perceive, remember, or relate the events in question.

After considering his testimony in light of all the evidence in the case, you may give it whatever weight, if any, you find that it deserves.

(Id. at 102.)

In light of the foregoing, defendant's argument that Frick should have moved to strike Opat's testimony is without merit. Defendant failed to show Frick's performance was deficient and he was prejudiced by her alleged deficiency. With respect to whether Frick's performance was deficient, defendant does not cite any legal basis upon which Opat's testimony was improper. Defendant argues that he never met Opat. Whether defendant met Opat prior to the trial, however, is a dispute of fact that—as the government points out—could be resolved by defendant testifying that he never met Opat prior to trial. Defendant, however, exercised his right not to testify. Frick cross-examined Opat and presented evidence to the jury that Opat was under the influence of marijuana during his encounter with defendant, and the court instructed the jury that Opat's testimony must be analyzed with "care and caution" because "[t]he testimony of a witness who was under the influence of drugs may be less believable because of the effect the drugs may have had on his ability to perceive, remember, or relate the events in question." (ECF No. 194 at 102.) Under those circumstances, the court cannot conclude that Frick's performance fell below an objective standard of reasonableness rendering her performance deficient.

With respect to whether defendant was prejudiced by Frick's failure to object to Opat's testimony, in light of the other testimony implicating defendant's high-level involvement in the conspiracy, defendant failed to show that there is a reasonable probability that, but for Frick failing to move to strike Opat's testimony, the result of the proceeding would have been

different. The government presented other information sufficient to convict defendant without presenting Opat's testimony. As the government noted, Opat's testimony was cumulative evidence of defendant's guilt. Defendant failed to show he was prejudiced by Frick's alleged error. Defendant, therefore, failed to show a fundamental error occurred warranting coram nobis relief with respect to this issue.

### c. Frick failed to suppress prior inconsistent statements made by Carter, Johnston, and Perez

Defendant argues:

> As several witnesses testified that they did not receive anything from petitioner directly in the form of checks by received it from a friend of petitioner who indicated it came from a petitioner- such testimony should not be admitted in the court of law without the actual receiver of the instrument of crime. See ( trial transcript testimony Ms. Carter, Mr. Johnston and Juan Perez). After trial counsel demonstrated that Ms. Carter, Ms. Johnston and Juan Perez Government witnesses had provided prior inconsistent statements, it was the duty of trial counsel Sally Frick to suppress such statement in light of Tome v. United States 513 U.S. 150 (1995) such frivolous behavior, a conduct that constitute ineffective assistance of counsel.

(ECF No. 250 at 17.) It is unclear based upon the foregoing what defendant is arguing forms the basis of a fundamental error in this case. Chereese Carter ("Carter") testified that:

- defendant and his girlfriend, Nicholas, came to Carter's house in defendant's vehicle with a check (ECF No. 194 at 131-32);

- defendant, Nicholas, and Carter went in defendant's car together to Wal-Mart (id. at 131);

- Nicholas and Carter went inside Wal-Mart to cash the check (id. at 132);

- Carter cashed the check, and gave the cash to Nicholas (id. at 133); and

- Nicholas split the money into thirds and distributed a third each to defendant, Carter, and herself (id.).

Frick on cross-examination impeached Carter by omission. Frick showed Carter a transcript of her testimony before the grand jury and a report from one of the agents investigating defendant's

case. Carter testified that according to the documents shown to her by Frick, she did not implicate defendant's involvement in the circumstances surrounding her cashing the check with Nicholas. (ECF No. 194 at 136-40.)

Nicole Johnston ("Johnston") testified that:

- Nicholas approached her about the check-cashing scheme (ECF No. 194 at 97);

- Nicholas told her she was going to get the counterfeit check from defendant (<u>id.</u> at 98);

- she attempted to cash five counterfeit checks and successfully cashed three of them (<u>id.</u> at 99);

- on at least two occasions, she cashed a check, gave the cash to Nicholas, and Nicholas split the cash into thirds, giving a third each to Johnston and defendant, and keeping a third for herself (<u>id.</u> at 101);

- on another occasion, Johnston received a check from Nicholas and defendant (<u>id.</u> at 103);

- she obtained her uncle's payroll check and gave it to Nicholas and defendant (<u>id.</u> at 105);

- when she received the payroll check back, it was altered (<u>id.</u> at 106);

- she attempted to cash the payroll check with defendant and Nicholas, but was not successful (<u>id.</u> at 106-08);

- defendant informed Johnston that special paper and ink are used to print checks (<u>id.</u> at 108); and

- she attempted to cash a fifth check with defendant and another man (<u>id.</u> at 108-09).

Johnston on cross-examination by Frick testified that:

- she told an agent that she never received the checks directly from one individual (ECF No. 194 at 113);

- she told law enforcement that she received three of the counterfeit checks from Nicholas and an individual that was not defendant (<u>id.</u> at 115);

- in some of her prior statements, she discussed her three successful attempts at cashing checks, but not her two failed attempts (<u>id.</u> at 119);

- in some of her prior statements, she said Nicholas and another individual, who was not defendant, gave her the checks (<u>id.</u>); and

- in some of her prior statements, she said she did not know who was making the checks (id. at 120).

Perez testified that:

- he became involved in the check-cashing scheme in 2008 when defendant discussed it with him at defendant's home (ECF No. 194 at 58);

- he provided defendant his identification card because defendant was going to put Perez's address on the counterfeit check (id. at 60);

- defendant gave him the counterfeit check (id. at 61);

- defendant recommended that Perez cash the check at Wal-Mart (id.);

- once Perez cashed the check, he split half the proceeds with defendant (id.);

- Perez recalled cashing three counterfeit checks, all of which he received from defendant (id. at 62-63);

- defendant asked Perez's friend to cash a check for him (id. at 64);

- he cashed checks in Philadelphia, Pennsylvania, and split the proceeds with defendant (id. at 65);

- defendant gave his friend a counterfeit check, cashed it, and split the proceeds with defendant (id. at 66-67);

- defendant asked Perez to recruit a woman who was at defendant's house to cash counterfeit checks for defendant (id. at 69); and

- the woman agreed to cash a counterfeit check with defendant, cashed the check, and split the proceeds with defendant (id. at 70).

On cross-examination by Frick, Perez testified he did not initially inform law enforcement that he recruited his friend and the woman at defendant's apartment to cash counterfeit checks for defendant. (ECF No. 194 at 78-79.)

Defendant's first argument with respect to the testimony by Carter, Johnston, and Perez is that "that they did not receive anything from petitioner directly in the form of checks" and, therefore, "such testimony should not be admitted in the court of law without the actual receiver

of the instrument of crime." (ECF No. 250 at 17.) Based upon the court's review of the testimony by Carter, Johnston, and Perez, defendant's argument is meritless. Each witness testified with respect to defendant's involvement in the conspiracy with which he was charged. Even if defendant did not directly provide a check to a witness is not grounds to strike that witness' testimony. Perez and Johnson, furthermore, testified that they each received a check directly from defendant. Defendant's arguments, therefore, are insufficient for the court to find a fundamental error occurred warranting coram nobis relief with respect to this issue. To the extent defendant is arguing he has a claim for ineffective assistance of counsel based upon Frick's failure to object to the testimony of Carter, Johnston, and Perez, that argument lacks merit because as discussed, there is no legal basis upon which Frick could have objected to their testimony. Under those circumstances, defendant cannot prove that Frick's performance was deficient.

With respect to defendant's arguments about the witnesses' prior inconsistent statements, defendant cites Tome v. United States, 513 U.S. 150 (1995). Tome, however, is inapplicable to this case and does not support defendant's arguments. In Tome, the Supreme Court of the United States reversed the judgment of the Court of Appeals for the Tenth Circuit and held that under Federal Rule of Evidence 801(d)(1)(B), "a declarant's consistent out-of-court statements [are admissible] to rebut a charge of recent fabrication or improper influence or motive only when those statements were made before the charged recent fabrication or improper influence or motive." Tome, 513 U.S. at 167. In that case, a daughter alleged her father sexually assaulted her. The father argued the daughter asserted he assaulted her so that she did not have to return to the father's home. The government introduced evidence of the daughter's prior consistent out-of-court statements regarding her father's alleged sexual abuse to rebut the father's arguments with

respect to the daughter's improper motive. The daughter's prior consistent statements, however, were made after the father alleged the daughter's motivation in accusing him of sexually assaulting her were improper. The court held that under Rule 801(d)(1)(B), the prior consistent statements were not admissible because "a declarant's consistent out-of-court statements [are admissible] to rebut a charge of recent fabrication or improper influence or motive only when those statements were made before the charged recent fabrication or improper influence or motive." <u>Tome</u>, 513 U.S. at 167.

Defendant in this case does not point to any prior consistent statements made by Carter, Johnston, or Perez that were introduced to rebut a charge of improper motive in this case or indicate how Rule 801(d)(1)(B) applies to this case; rather, Frick thoroughly cross-examined each witness with respect to their prior statements. Under those circumstances, defendant did not show how he received ineffective assistance of counsel with respect to this issue, and is not entitled to coram nobis relief.

**d.  Frick failed to ensure at least one juror was black**

Defendant argues that Frick provided ineffective assistance of counsel because she failed to adhere to his request "to select at least one juror of his peer (black)." (ECF No. 250 at 17.) According to defendant, Frick "allowed the prosecuting team to strike out only two black jurors in the jury team[,]" and "[i]t's unclear what excuses counsel gave for allowing that situation." (<u>Id.</u>) (citing <u>Batson v. Kentucky</u>, 471 U.S. 1052 (1985)). ). In <u>Batson</u>, the United States Supreme Court held that "the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race." <u>Batson v. Kentucky</u>, 476 U.S. 79, 89 (1986). <u>Batson</u> provides a three-step process for a trial court to use in adjudicating a claim that a peremptory challenge was based on race:

First, the party asserting the claim must make out a prima facie case. See 476 U.S. at 96, 106 S.Ct. 1712. In order to do this, the party must point to facts that "raise an inference" that a challenged strike was based on an impermissible ground. Id. Second, if a prima facie case is established, the party who exercised the challenge must "come forward with a neutral explanation." Id. Third, if a neutral explanation is offered, the trial judge must make a finding as to whether the contested peremptory was based on an impermissible ground. Id. at 98, 106 S.Ct. 1712.

Brinson v. Vaughn, 398 f.3d 225, 227 (3d Cir. 2005).

[A] defendant may establish a prima facie case of purposeful discrimination in selection of the petit jury solely on evidence concerning the prosecutor's exercise of peremptory challenges at the defendant's trial. To establish such a case, the defendant first must show that he is a member of a cognizable racial group, Castaneda v. Partida, supra, 430 U.S., at 494, 97 S.Ct., at 1280, and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race. Second, the defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits "those to discriminate who are of a mind to discriminate." Avery v. Georgia, 345 U.S., at 562, 73 S.Ct., at 892. Finally, the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race. This combination of factors in the empaneling of the petit jury, as in the selection of the venire, raises the necessary inference of purposeful discrimination.

In deciding whether the defendant has made the requisite showing, the trial court should consider all relevant circumstances. For example, a "pattern" of strikes against black jurors included in the particular venire might give rise to an inference of discrimination. Similarly, the prosecutor's questions and statements during voir dire examination and in exercising his challenges may support or refute an inference of discriminatory purpose. These examples are merely illustrative. We have confidence that trial judges, experienced in supervising voir dire, will be able to decide if the circumstances concerning the prosecutor's use of peremptory challenges creates a prima facie case of discrimination against black jurors.

Batson, 476 U.S. at 96.

Based upon defendant's arguments, he may satisfy the first and second elements of the prima facie case of a Batson challenge. Defendant, based upon his arguments, may also satisfy the third element of the prima facie case, i.e., to show the facts of this case raise an inference that

the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race. Id. Defendant argues that Frick "allowed the prosecuting team to strike out only two black jurors in the jury team[.]"(ECF No. 250 at 17.) This allegation, if true, may show that the government had a pattern of strikes against black jurors, i.e., it used two of its strikes to strike every black juror on the panel. Under Batson, a pattern of strikes against black jurors may give rise to an inference of discrimination. Batson, 476 U.S. at 96.

Because defendant may be able to establish the prima facie case for a Batson claim, the government must offer a race-neutral basis for striking the jurors in question. Brinson, 398 F.3d at 227. The government in its response brief to defendant's writ of coram nobis did not offer any argument or evidence with respect to the reason it used two of its preemptory strikes against the only African-American members of the jury panel. Reviewing the submissions of the parties, there may be a Batson claim, and Frick's performance may have been deficient for failing to raise the claim prior to trial.

With respect to the prejudice prong of the Strickland analysis, a defendant is presumptively prejudiced by a Batson violation because such a violation "undermines the integrity of the entire trial[.]" SmithKline Beecham Corp. v. Abbott Laboratories, 740 F.3d 471, 488 (9th Cir. 2014). The Supreme Court in Powers v. Ohio, 499 U.S. 400 (1991), explained:

> A prosecutor's wrongful exclusion of a juror by a race-based peremptory challenge is a constitutional violation committed in open court at the outset of the proceedings. The overt wrong, often apparent to the entire jury panel, casts doubt over the obligation of the parties, the jury, and indeed the court to adhere to the law throughout the trial of the cause. The voir dire phase of the trial represents the "jurors' first introduction to the substantive factual and legal issues in a case." Gomez, supra, 490 U.S., at 874, 109 S.Ct., at 2247. The influence of the voir dire process may persist through the whole course of the trial proceedings. Ibid. If the defendant has no right to object to the prosecutor's improper exclusion of jurors, and if the trial court has no duty to make a prompt inquiry when the defendant shows, by adequate grounds, a likelihood of impropriety in the exercise of a challenge, there arise legitimate doubts that the jury has been chosen by proper

means. The composition of the trier of fact itself is called in question, and the irregularity may pervade all the proceedings that follow.

The purpose of the jury system is to impress upon the criminal defendant and the community as a whole that a verdict of conviction or acquittal is given in accordance with the law by persons who are fair. The verdict will not be accepted or understood in these terms if the jury is chosen by unlawful means at the outset. Upon these considerations, we find that a criminal defendant suffers a real injury when the prosecutor excludes jurors at his or her own trial on account of race.

Powers, 499 U.S. at 412-13.

As discussed above, however, defendant did not provide sound reasons for failing earlier to seek relief for his ineffective assistance of counsel claim based upon Frick's failure to raise a Batson challenge. Defendant's request for relief must, therefore, be denied because demonstrating sound reasons exist for failing to seek relief earlier is a "threshold condition[] to *coram nobis* relief." Babalola, 248 F. App'x at 412 (citing Stoneman, 870 F.2d at 105). All the information defendant relies upon with respect to his claim for ineffective assistance of counsel, i.e., the government used its preemptory strikes to strike the only two African-American jurors on the jury panel and Frick did not raise a Batson challenge prior to trial, was available to defendant when he filed his § 2255 motion on November 16, 2012. (ECF No. 236.) This court cannot, therefore, afford defendant the coram nobis relief he now seeks. Mendoza, 690 F.3d at 159 ("Although Mendoza's counsel's deficient performance may have precluded him from seeking relief at the time of his plea, Mendoza cannot show any "sound reasons" for his lengthy delay in seeking relief since that time.").

### e.    Frick failed to file a timely appeal[6]

---

[6] Defendant in his reply argues "at the time of filing petitioner 2255 habeas, petitioner had still no information from his attorney as far as discovery package, as she repeatedly refused to release those evidential material, by way to prevent her client from appellate proceedings." (ECF No. 260 at 18.) To the extent this argument is an attempt to set forth sound reasons defendant failed to earlier seek relief, it is vague, conclusory and not sufficient. In any event, defendant's

Defendant asserts a claim for ineffective assistance of counsel based upon Frick's failure to file a timely appeal to the Third Circuit Court of Appeals. (ECF No. 250 at 11.) Defendant's appellate brief was due to the court of appeals "on or before 10/14/2011." United States v. Mensah-Yawson, Court of Appeals Docket No. 11-1103, Sept. 14, 2011. Frick did not file defendant's appellate brief on that date. The court of appeals required Frick to "SHOW CAUSE in writing why counsel has failed to file brief and appendix" in accordance with the deadline set forth by the court of appeals. Mensah-Yawson, Court of Appeals Docket No. 11-1103, Oct. 25, 2011. Frick responded to the court of appeal's show cause order, and the court of appeals entered an order permitting Frick to file defendant's brief and appendix on or before November 18, 2011. Mensah-Yawson, Court of Appeals Docket No. 11-1103, Nov. 10, 2011. On November 17, 2011, Frick filed defendant's appellate brief and appendix with the court of appeals. Mensah-Yawson, Court of Appeals Docket No. 11-1103, Nov. 17, 2011. On June 20, 2012, the Court of Appeals for the Third Circuit issued an opinion addressing on the merits the issues raised in defendant's appellate brief. United States v. Mensah-Yawson, 489 F. App'x 606 (3d Cir. 2012).

Arguably, Frick's performance may have fallen below an objective standard of reasonableness because she initially missed the deadline for filing defendant's appellate brief and appendix with the court of appeals. Defendant, however, did not show how he was prejudiced by Frick's deficient performance. The court of appeals considered and ruled upon the merits of the appellate brief and appendix filed by Frick prior to the second deadline. Under those circumstances, defendant did not set forth a viable claim for ineffective assistance of counsel which entitles him to coram nobis relief with respect to this issue.

---

underlying claim is meritless because he cannot show that he was prejudiced by Frick's failure to timely file an appellate brief and appendix with the court of appeals.

**f.    Frick failed to raise ineffective assistance of counsel claims on appeal**

Defendant argues that he received ineffective assistance of counsel because Frick failed to raise defendant's ineffective assistance of counsel claims on appeal to the Court of Appeals for the Third Circuit. "[A]n ineffective-assistance-of-counsel claim may be brought in a collateral proceeding under § 2255, whether or not the petitioner could have raised the claim on direct appeal." Massaro v. United States, 538 U.S. 500, 504 (2003). The Court of Appeals for the Third Circuit has recognized:

> Ineffective assistance of counsel claims are not generally entertained on direct appeal. See United States v. Theodoropoulos, 866 F.2d 587 (3d Cir.1989). This court has held repeatedly, "the proper avenue for pursuing such claims is through a collateral proceeding in which the factual basis for the claim may be developed." Id. at 598. There is, however, a narrow exception to the rule that defendants cannot attack the efficacy of their counsel on direct appeal. Where the record is sufficient to allow determination of ineffective assistance of counsel, an evidentiary hearing to develop the facts is not needed. Government of Virgin Islands v. Zepp, 748 F.2d 125, 133 (3d Cir.1984) (defendant's counsel was ineffective because of a conflict of interest); see also Theodoropoulos, 866 F.2d at 598 (no direct review "[u]nless the record sufficiently establishes a basis for our review").

United States v. Headley, 923 F.2d 1-79, 1083 (3d Cir. 1991). Assuming defendant's ineffective assistance of counsel claims were proper for direct appeal to the court of appeals, this court cannot conclude that Frick's performance was deficient because she failed to raise ineffective assistance of counsel claims about herself. The Sixth Circuit Court of Appeals has explained:

> As the Supreme Court has noted, it is axiomatic that "an attorney ... is unlikely to raise an ineffective-assistance claim against himself." Massaro v. United States, 538 U.S. 500, 503, 123 S.Ct. 1690, 155 L.Ed.2d 714 (2003); see also Fautenberry v. Mitchell, 515 F.3d 614, 640 (6th Cir.2008) ("[W]e conclude that it would be unreasonable to expect counsel to raise an ineffective assistance claim against himself."). Aside from the potential conflict of interest inherent in such a claim-which we will address shortly-"[e]ven the scrupulous attorney searching the record in good faith would likely be blind to his [own] derelictions at ... trial...." Billy-Eko v. United States, 8 F.3d 111, 114 (2d Cir.1993), abrogated on other grounds by Massaro, 538 U.S. at 504, 123 S.Ct. 1690.

United States v. Munoz, 605 F.3d 359, 370 (6th Cir. 2010); Diaz v. Howes, Civ. Action No. 09-610, 2015 WL 869174, at *31 (W.D. Mich. Feb. 27, 2015).

Notwithstanding any conflict arising from Frick asserting ineffective assistance of counsel claims about her own performance,[7] defendant was not prejudiced by Frick's failure to raise claims for ineffective assistance of counsel on direct appeal from his conviction. Defendant filed a § 2255 motion with the court, which the court fully addressed and considered. Defendant received an opportunity to raise his ineffective assistance of counsel claims with the court. Defendant did not show that, if he raised his ineffective assistance of counsel claims on direct appeal to the court of appeals, there is a reasonable probability that the outcome of the

---

[7] The court in Diaz explained:

> Finally, petitioner contends that Attorney Wilkinson provided ineffective assistance of appellate counsel because he acted as both trial and appellate counsel and was "potentially in conflict with his own interest and unlikely to raise ineffective assistance against himself." Petitioner's Objections (docket no. 25 at p. ID# 164).
>
> …
>
> Petitioner asks this Court to rule that a criminal defendant's trial counsel who later acts as appellate counsel is per se ineffective due to a "potential" conflict of interest. Contrary to petitioner's claim, there is no per se conflict of interest when the same attorney represents a criminal defendant on direct appeal. While petitioner cites Nichols as his authority for habeas relief, that case does not recognize such a per se conflict of interest. On the contrary, in Nichols, the court evaluated the merits of the ineffective assistance claim under the Strickland standard after observing that "[the petitioner] was represented by the same attorney ... at trial and on direct appeal; thus he is allowed to raise his ineffective assistance claim on collateral attack." Nichols, 75 F.3d at 1141. More importantly, the Sixth Circuit has determined that "the rather normal occurrence of trial counsel also acting as appellate counsel on direct appeal ... in itself, does not create any obvious prejudice." Whiting v. Burt, 395 F.3d 602, 619 (6th Cir.2005). In reaching this determination, the Sixth Circuit found such representation to be the norm, observing that "the rules of this Court provide that trial counsel in criminal cases, whether retained or appointed by the district court, is responsible for the continued representation of the client on appeal unless specifically relieved by this Court. 6 Cir. R. 101(a)." Id. at 619, fn. 10. Accordingly, petitioner's claim of ineffective assistance of appellate counsel should be denied.

Diaz, 2015 WL 869174, at *31.

proceeding would be different. Under those circumstances, defendant did not show that Frick was deficient for failing to raise ineffective assistance of counsel claims about herself or that he was prejudiced by Frick's allegedly deficient performance. Defendant, therefore, failed to show a fundamental error occurred with respect to this issue warranting coram nobis relief.

**B. Sentenced under incorrect statute/procedural default**

Defendant was convicted of violating 18 U.S.C. § 371, which provides:

> If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both.
>
> If, however, the offense, the commission of which is the object of the conspiracy, is a misdemeanor only, the punishment for such conspiracy shall not exceed the maximum punishment provided for such misdemeanor.

18 U.S.C. § 371. Pursuant to this statute, it is a crime to conspire to either (1) "commit any offense against the United States;" or (2) "defraud the United States, or any agency thereof in any manner or for any purpose." Id. The indictment in this case, which charges defendant with violating § 371, provides:

> From on or about November 19, 208, and continuing thereafter until on or about January 22, 2009, in the Western District of Pennsylvania, the defendants, STEVEN MENSAH-YAWSON, STACY NICHOLAS, JAMES GREER, AND DANIEL POOLE knowingly and willfully did conspire, combine, confederate and agree together and with each other, and with other persons both known and unknown to the grand jury, to commit offenses against the United States, that is, Making Uttering or Possessing a Counterfeit Security, in violation of Title 18, United States Code, Section 513(a).
>
> …
>
> In violation of Title 18, United States Code, Section 371.

(ECF No. 1.) The court in its preliminary charge to the jury stated:

> In this case the government has charged Mr. Yawson of violating federal law. Specifically, he has been charged with conspiracy to commit an offense against

the United States from November 19th, 2008 an continuing to January 22nd, 2009, in the Western District of Pennsylvania.

To produce the evidence, the government has charged Mr. Yawson knowingly conspired with one or more other persons to commit an offense against the United States. Specifically, that he conspired with others to make, possess, and cash 48 counterfeit payroll checks.

I will give you detailed instructions on the law at the end of the case. Those instructions will control your deliberation and your decision. In order to help you follow the evidence, I'll give you a brief summary of the elements of the offense.

First, that two or more persons agree to commit an offense against the United States as charged in the indictment.

Second, that Mr. Yawson was a party to or a member of that agreement.

Third, that he joined the agreement or conspiracy, knowing of its objective to commit an offense against the United States, and the defendant joined together with at least one other alleged conspirator to achieve that objective. That is, Mr. Yawson, and at least one other person, shared a unity of purpose and the intent to commit an offense against the United States; specifically, making, possessing, and cashing counterfeit payroll checks.

Finally, that at some time during the existence of the agreement or the conspiracy, at least one of its members performed an overt act in order to further the objectives of the agreement.

(ECF No. 194 at 18-19.) The court in its final charge to the jury stated:

The indictment charges that from November 19, 2008, 'til January 22, 2009, Mr. Yawson conspired with one or more other persons to commit an offense against the United States. Specifically, that he made, possessed, and cashed counterfeit payroll checks, and that to further the objective of the conspiracy at least one member of the conspiracy committed at least one overt act as alleged in the indictment.

It is a federal crime for two or more persons to conspire to commit any offense against the United States, even if they never actually achieve their objective. A conspiracy is a kind of criminal partnership.

In order for you to find Mr. Yawson guilty of conspiracy to commit an offense against the United States, you must find that the government proved beyond a reasonable doubt each of the following four elements:

First, that two or more persons agreed to commit an offense against the United States as charged in the indictment;

Second, that Mr. Yawson was a party to or a member of that agreement;

Third, that he joined the agreement knowing of its objective to commit an offense against the United States, and intending to join together with at least one other alleged conspirator to achieve that objective; that is, that Mr. Yawson and at least one other alleged co-conspirator shared a unity of purpose and the intent to commit an offense against the United States;

And fourth, that at some time during the existence of this agreement, at least one of its members performed an overt act in order to further the objective of the agreement.

…

Now, as was discussed before, the conspiracy charge against Mr. Yawson has as its objective the offense of making, possessing, and cashing counterfeit payroll checks. The substantive offense charged in this case is conspiracy to commit an offense against the United States, not the offense of making, possessing, and cashing counterfeit payroll checks. However, it will be helpful for you to understand the nature of the offense of making, possessing, and cashing counterfeit payroll checks. Therefore, I will describe the elements of that offense and define some of its terms.

The elements of the offense are as follows:

First, that someone made, passed, or attempted to pass a counterfeit check;

Second, that the counterfeit check was that of an organization;

Third, that someone possessed the counterfeit or forged check with intent to deceive another person or another organization. The term "counterfeited" means a document that purports to be genuine, but is not, because it has been falsely made in its entirety.

The term "forged" means a document that purports to be genuine, but it has been fraudulently altered, completed, signed, or endorsed, or contains a false addition, or is a combination of parts of two or more genuine documents. The term "security" includes a check. The term "organization" means a non-government legal entity. And it includes, but is not limited to, a corporation, a company, association, firm, partnership, joint stock company, or any other association of persons that operates in or the activities of which affect interstate or foreign commerce.

To act with "intent to deceive" means to act with specific intent to deceive or to cheat, usually for personal financial gain or to cause financial loss to someone else. The government, however, does not have to prove that anyone was in fact deceived.

(ECF No. 195 at 362-63, 69-70.)

The jury verdict slip in this case in part provided:

Do you find that the government has proven by proof beyond a reasonable doubt that Steven Mensah-Yawson knowingly conspired with one or more other persons to commit an offense against the United States, specifically, that he conspired with others to make, possess, and cash counterfeit payroll checks?

(ECF No. 161 at 1.) Based upon the foregoing, it *is* clear—and *was* clear when defendant was charged and convicted at trial—that defendant was convicted under 18 U.S.C. § 371 because he conspired to violate 18 U.S.C. § 513(a).

Defendant in his writ of coram nobis argues:

- "A person cannot be convicted under §371 of conspiring to commit crime against United States when facts reveal that there could be no violation of a statue under which conspiracy is charge." (ECF No. 250 at 4.)

- "At this time, it's unclear what category petitioner was sentenced under. Also, unclear what category petitioner was convicted under." (Id. at 7.)

- "[T]his court should have implemented the categorical approach, to examine the two types of §371 and part of jury instructions during trial and sentencing. The jury should have received specific instructions on categorical approach during the verdict." (Id. at 6.)

Defendant in his reply to the government's response argues "[t]he indictment memo, and the record of conviction does not mention anything about 18 USC 513(a)." (ECF No. 260 at 7.) Defendant, however, does not cite to any authority indicating that it was fundamental error—in light of the indictment, jury instructions, and verdict slip in this case—for the indictment memorandum and Judgment and Conviction not to include a citation to 18 U.S.C. § 513(a). Both documents contain the citation to the crime with which defendant was charged, i.e., 18 U.S.C. § 371. Defendant in this case by way of the indictment had notice of the crime with which he was charged, 18 U.S.C. § 371, and the court clearly identified to the jury the crime with which

30

defendant was charged, i.e., a violation of 18 U.S.C. § 371, and the elements of both that crime

and the crime underlying the conspiracy, i.e., 18 U.S.C. § 513(a).

Defendant argues, however, that the court should have applied the modified categorical

approach in this case and instructed the jury on the same. In Descamps v. United States, 133

S.Ct. 2276 (2013), the Supreme Court of the United States explained:

> [T]he modified approach serves a limited function: It helps effectuate the
> categorical analysis when a divisible statute, listing potential offense elements in
> the alternative, renders opaque which element played a part in the defendant's
> conviction.

Id. at 2283. The modified categorical approach is used for divisible statues that have two or more

alternative elements. Id. The modified categorical approach allows the court to "consult a limited

class of documents, such as indictments and jury instructions to determine which alternative

formed the basis of the defendant's prior conviction." Id.[8] As the government points out, the

_____

[8] The Supreme Court in Descamps explained:

> The Armed Career Criminal Act (ACCA or Act), 18 U.S.C. § 924(e), increases
> the sentences of certain federal defendants who have three prior convictions "for a
> violent felony," including "burglary, arson, or extortion." To determine whether a
> past conviction is for one of those crimes, courts use what has become known as
> the "categorical approach": They compare the elements of the statute forming the
> basis of the defendant's conviction with the elements of the "generic" crime— i.e.,
> the offense as commonly understood. The prior conviction qualifies as an ACCA
> predicate only if the statute's elements are the same as, or narrower than, those of
> the generic offense.
>
> We have previously approved a variant of this method—labeled (not very
> inventively) the "modified categorical approach"—when a prior conviction is for
> violating a so-called "divisible statute." That kind of statute sets out one or more
> elements of the offense in the alternative—for example, stating that burglary
> involves entry into a building or an automobile. If one alternative (say, a building)
> matches an element in the generic offense, but the other (say, an automobile) does
> not, the modified categorical approach permits sentencing courts to consult a
> limited class of documents, such as indictments and jury instructions, to
> determine which alternative formed the basis of the defendant's prior conviction.
> The court can then do what the categorical approach demands: compare the

modified categorical approach is most often used under the Armed Career Criminal Act (the "ACCA"), 18 U.S.C. § 924, to determine whether certain offenses are violent felonies or serious drug offenses. The ACCA increases the sentences of certain federal defendants who have three prior convictions for a violent felony or serious drug offenses. <u>Descamps</u>, 133 S.Ct. at 2282. Courts use the categorical approach to determine whether a state conviction qualifies as a predicate felony under the ACCA. <u>Id.</u> "The prior conviction qualifies as an ACCA predicate only if the statute's elements are the same as, or narrower than, those of the generic offense". <u>Id.</u> at 2281. The modified categorical approach is also used under title 8 of the United States Code with respect to immigration and deportation proceedings. <u>See</u> <u>Pagayon v. Holder</u>, 675 F.3d 1182, 1189 n.1 (9th Cir. 2011) (recognizing in a removal case that "[t]he modified categorical approach applies when the simple fact of conviction of a state-law crime does not automatically establish removability under federal law"). Defendant in this case has failed to show how application of the modified categorical approach is relevant in this case or that he was sentenced under the wrong statute; indeed, his Judgment and Conviction provides that he was convicted of 18 U.S.C. § 371. Based upon the foregoing, defendant failed to show there was a fundamental error warranting relief under a writ of coram nobis based upon his argument that he was sentenced under the wrong statute.

C. **<u>Subject-Matter Jurisdiction</u>**

Defendant argues

The record clearly indicates that there were no government functioning or agency victimization in the alleged conspiracy. Hence, this Honorable Court had no jurisdiction to hear petitioner's indictment under 18 USCS [sic],supra, the

---

elements of the crime of conviction (including the alternative element used in the case) with the elements of the generic crime. <u>Descamps</u>, 133 S.Ct. at 2281.

> government shall prove in what manner petitioner defrauded an agency of the United States government.

(ECF No. 250 at 15.) As the court indicated in its opinion rejecting a similar argument made by defendant in his § 2255 motion,[9] "[i]t is well accepted that section 371 criminalizes conspiracies to commit any federal crime, not just those directed against the government. Specifically, section 371 'refers to two types of conspiracies: (1) conspiracy to commit a substantive offense proscribed by another statute' as well as '(2) conspiracy to defraud the United States.'" (ECF No. 244 at 11) (quoting United States v. Alston, 77 F.3d 713, 718 (3d Cir. 1996).) As discussed above, defendant was indicted for conspiring to commit 18 U.S.C. § 513(a), and not for defrauding the United States or an agency thereof. Accordingly, defendant's argument that the United States was not victimized in this case, and, therefore, the court lacks subject-matter jurisdiction, is not meritorious. Defendant failed to show a fundamental error occurred with respect to this issue.

### D.  More Severe Sentence than Expected / Loss to Victims/Conspiracy[10]

---

[9] In defendant's § 2255 motion, he argued Frick was ineffective "for failure to moves for dismissal of the indictment because no violation against the United Sates had occurred under §371." (ECF No. 236 at 4.)

[10] Defendant in his reply brief argues the government argued Nicholas had a larger role in the conspiracy than defendant, and, therefore, it was improper for defendant to receive enhancement for a leadership role under the Sentencing Guidelines. This is a mischaracterization of the record. The government in its closing stated:

> Nicole Johnston. Told you about Stacy Nicholas. In fact, said Stacy Nicholas layed a larger role than Mr. Yawson.

(ECF No. 195 at 139.) In any event, Application Note 4 to United States Sentencing Guideline § 3B1.1 provides that "[t]here can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy." In light of the testimony and other evidence presented at trial that defendant created and printed the counterfeit checks used to commit the crime charged in the indictment and recruited others, such as Opat and Perez, to participate in the conspiracy, the two-level enhancement under § 3B1.1 was warranted in this case.

This issue could have been raised on appeal or in defendant's § 2255 motion. Failure to do so precludes the grant of relief defendant seeks now. Mendoza, 690 F.3d at 159-60 (affirming

Defendant argues his rights under the Sixth Amendment to the Constitution were violated when the court imposed upon him restitution in the amount of $43,645.98, and determined a loss amount attributable to defendant of $54,582.52, because a jury did not determine those amounts beyond a reasonable doubt. (ECF No. 250 at 7-8, 17-18) (citing Apprendi v. New Jersey, 530 U.S. 466 (2000); United States v. Booker, 543 U.S. 220 (2005); Blakely v. Washington, 542 U.S. 296 (2004)). Defendant also argues "that the total amount offense did not reach an amount of $10,000." (Id. at 18.)[11]

Defendant's argument that he is entitled to relief because the jury did not determine beyond a reasonable doubt the total loss and restitution amounts is meritless. Apprendi, Booker, and Blakely, do not support defendant's argument. In Apprendi, the Supreme Court of the United States held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." Apprendi, 530 U.S. at 2362-63. The Supreme Court later in Alleyne v. United States, 133 S.Ct. 2151 (2013), "extended the *Apprendi* rule to proof of facts that increase a mandatory minimum sentence, requiring such facts to be submitted to a jury and proven beyond a reasonable doubt." United States v. Burnett, 773 F.3d 122, 136 (3d Cir. 2014)

---

the decision of the district court to deny a defendant's motion for coram nobis because the defendant did not provide sound reasons for failing to earlier raise his arguably meritorious claim).

[11] Defendant in his reply argues that Frick rendered ineffective assistance of counsel because she did not inquire about how the court reached the restitution amount of $43,645.98. As explained herein, the Judgment and Conviction lists the victims and actual loss amount attributable to defendant, which totals $43,645.98. Defendant did not set forth sufficient evidence to show that even if Frick objected to restitution amount, which is explained in defendant's Judgment and Conviction, there is a reasonable probability the outcome would have been different. Under those circumstances, defendant does not have a valid ineffective assistance of counsel claim with respect to this issue. Furthermore, defendant did not set forth sufficient argument to show he has sound reasons for failing to earlier seek relief with respect to this claim.

(citing Alleyne, 133 S.Ct. at 2160). In Blakely, the Court "held that the additional factfinding necessary for a judge to sentence within a high subrange was comparable to the finding of additional fact required for a judge to impose an enhanced sentence under the law considered in Apprendi." Rita v. United States, 551 U.S. at 2486-87 (2007) (Souter , J., dissenting). In Booker, the Court "applied Blakely's reasoning and held that the Federal Guidelines, too, subjected defendants to unconstitutional sentences in upper subranges, absent a jury finding or waiver," and determined the United States Sentencing Guidelines were no longer mandatory. Rita, 551 U.S. at 2487.

Here, 18 U.S.C. § 371, the statute under which defendant was convicted and sentenced, prescribes a statutory maximum term of imprisonment of five years, and does not provide a mandatory minimum term of imprisonment. Defendant was imprisoned for twenty-three months prior to sentencing in this case, and the court sentenced him to time served. Accordingly, the loss amount in this case, which the court determined to be $54,582.52, did not increase a mandatory statutory maximum or minimum sentence. The court, therefore, did not commit a fundamental error by determining the total loss amount in defendant's case was $54,582.52.

To the extent defendant argues the court committed a fundamental error when it—and not a jury—determined the loss amount attributable to defendant was $54,582.52, and, therefore, added six levels to defendant's offense level, pursuant to U.S.S.G. § 2B1.1(b)(1)(E), defendant's argument lacks merit. The Third Circuit Court of Appeals has recognized that "[j]udicial factfinding in the course of selecting a sentence within the permissible range does not offend the Fifth and Sixth Amendment rights to a jury trial and proof beyond a reasonable doubt." United States v. Grier, 475 F.3d 556, 562 (3d Cir. 2007). In other words, a district court does not error in determining a defendant's sentencing guideline range when it applies a preponderance standard

to determine that range. <u>United States v. Ali</u>, 508 F.3d 136, 146 (3d Cir. 2007) ("Because the differing loss amounts do not increase defendants' sentences beyond the statutory maximums, there is no Sixth Amendment concern here with applying a preponderance standard for the sentencing calculation."). "'[T]he right to proof beyond a reasonable doubt does not apply to facts relevant to enhancements under an advisory Guidelines regime.'" <u>United States v. Blood</u>, 232 F. A'ppx 199, 205 (3d Cir. 2007) (citing <u>Grier</u>, 475 F.3d at 565.). Based upon the foregoing, the court did not commit a fundamental error and usurp the role of the jury when it added six additional levels to defendant's offense level based upon a loss amount of $54,582.52.

Defendant argues it was error for the court to impose upon him a restitution amount of $43,645.98 because, among other reasons, the jury did not determine the restitution amount applicable in this case beyond a reasonable doubt. The Third Circuit Court of Appeals, however, has held "that the Sixth Amendment right to jury determinations of certain facts as articulated in *Booker* does not apply to forfeiture or to orders of restitution imposed as part of a criminal sentence." <u>United States v. Leahy</u>, 438 F.3d 328, 338-39 (3d Cir. 2006); <u>United States v. Basile</u>, 570 F. App'x 252, 258 (3d Cir. 2014) ("Under our precedent, the District Court's determination of the restitution amount is not error at all. In <u>United States v. Leahy</u>, we held that judicial fact-finding in connection with a restitution order does not violate the Sixth Amendment."). The court did not, therefore, commit a fundamental error by determining restitution in the amount of $43,645.98 was warranted in this case.

Defendant argues the evidence presented at trial does not support the loss or restitution amount determined by the court. (ECF No. 250 at 18-21.) Defendant argues:

> During trial, the government introduced several witnesses who testified according to the record that they conspired with petitioner to negotiate counterfeit checks, Nicole Johnston, Juan Perez and Chereese Carter. In between these listed individuals, the total amount of checks allegedly negotiated was $6,382.73.

Juan Perez, two checks of 955.99+938.99=$1,894.98
Nicole Johnston three checks of $1,499.99+998.99+998.99=$3,497.97
Chereese Carter one check of $989.78

$6,382.73 is clearly less than $10,000- petitioner asserts that the amount of loss introduced during trial should be the amount it's attributed to.

…

The entire review of the petitioner's record, all trial record fails to establish any determination of the amount of loss petitioner was responsible for. Further the records cannot indicate how Government and the court came up with the total losses and <u>$43,645.98</u>

(ECF No. 250 at 19.) In defendant's § 2255 motion, he similarly argued that it was "error to hold him responsible of the total losses in the actual criminal case." (ECF No. 236 at 17-18.) The court in response to these arguments wrote:

> In support of his claim that he is not responsible for more than $10,000 of loss sustained as a result of the check-cashing scheme, Mensah-Yawson alleges only that "there is not a shred of evidence that his scope of [sic] agreement with the coconspirators reached an amount greater than $10,000. [Doc. No. 236 at 18-19.] He does not challenge either the documentary evidence the government introduced or the witness testimony the government developed at trial, nor does he argue that Ms. Frick was unreasonable for not objecting to this evidence's admission. He also offers no alternative calculation showing that the total loss attributable to him is indeed less than $10,000.
>
> In fact, contrary to Mensah-Yawson's conclusory allegation that there was not "a shred of evidence indicating that he was involved with more than $10,000 of loss, the evidence presented at trial showed that he was involved in and directed every aspect of the conspiracy. Several of his co-conspirators testified that he approached and struck deals with them to engage in and split the proceeds of the check fraud. [Doc. No. 239, <u>Ex.</u> 1 at 58-6].] A forensic analysis of his laptop computer showed that it contained a software program to design checks, as well as data files with the bank account numbers of the fraud victims (which had been deleted but were recovered by forensic specialists) and images of the counterfeit checks that were negotiated during the scheme. [<u>Id.</u> at 202-04, 208-18.] Additional evidence further showed that Mensah-Yawson had ordered special "check-making ink" from a company that specializes in that product and that he subsequently asked the company to delete his name and account information from its records. [<u>Id.</u> at 150-54, 164-65.]
>
> Regarding the loss amount specifically, the government presented testimony from two witnesses who specifically implicated Mensah-Yawson in the negotiation or

attempted negotiation of at least $10,498 in fraudulent checks. [Id. at 194 at 38 40, 99 102.] Testimony from the Secret Service agents assigned to the case further demonstrated that the loss to one of the fraud victims reached at least $20,000 and that the loss could be traced directly back to Mensah-Yawson. [Id. at 240, 244-54.] This testimony overwhelmingly indicated that Mensah-Yawson was the driving force behind the scheme. Under the U.S. Sentencing Guidelines, as the leader of the conspiracy, Mensah-Yawson is responsible not only for the loss he personally caused or intended to cause the fraud victims, but also any loss or intended loss that he knew or reasonably shou1d have known would occur in the course of the conspiracy. See U.S. SENTENCING GUIDELINES MANUAL 2011, §§ 1B1.3(a)(1)(B), 2B1.1 cmt. n.3(A) (2011).

This evidence is sufficient to support a finding that Mensah-Yawson was responsible for more than $10,000 of pecuniary loss. While the record shows that Ms. Frick brought to the court's attention the importance of the $10,000 figure to Mensah-Yawson's efforts to remain in the United States [id. at 6] the evidence adduced at trial left no doubt that the actual and intended loss of the conspiracy far surpassed $10,000. Any objection by Ms. Frick at sentencing to the total loss amount would have been non-meritorious thus the lack of such an objection was not unreasonable and could, not have been prejudicial. Real, 600 F.3d at 309. Mensah-Yawson has thus failed to show that Ms. Frick rendered constitutionally ineffective assistance of counselor that he had cause for his procedural default. Consequently, we will deny his motion to vacate his sentence on this ground as well.

(ECF No. 244 at 12-14.)

As the court noted, defendant is not only responsible for the loss attributed to his conduct; he is also responsible for the loss attributed to his co-conspirator's conduct. The court explained at defendant's sentencing that it determined the total loss in this case was $54,596.52, as was detailed in the indictment. (ECF No. 194 at 414.) The restitution amount imposed upon defendant, i.e., $43,645.98, is less than the amount of total loss $54,596.52, and is derived from the actual losses to the companies listed in defendant's Judgment and Conviction. (ECF No. 177 at 5-6.) As the court stated at defendant's sentencing, "[t]he victims' recovery is limited to the amount of their loss, and defendant's liability ceases if, and when, the victims receive restitution in full." (ECF No. 44 at 418.) For the reasons set forth in the court's opinion denying defendant's § 2255 opinion and the reasons stated herein, the court did not commit a fundamental error when

it increased defendant's offense level under the sentencing guidelines by six levels for a total loss amount of $54,586.52, and imposed upon defendant restitution in the amount of $43,645.98.

### E. **Non-disclosure of Grand Jury Minutes**

Defendant argues his due process and equal protection rights were violated when he was denied access to the notes of the grand jury that indicted him. According to defendant, he was charged in state court with nine other individuals, and of those ten people charged in state court, the federal grand jury indicted only four people, defendant and three co-conspirators. It appears defendant under this heading is arguing: (1) he was selectively prosecuted; and (2) he was improperly denied access to the grand jury minutes.

A decision to prosecute is selective and violates the right to equal protection when it is made on a discriminatory basis with an improper motive. United States v. Schoolcraft, 879 F.2d 64, 68 (3d Cir.1989). To establish selective prosecution, a defendant must demonstrate both that (1) persons similarly situated have not been prosecuted; and (2) the decision to prosecute was made on the basis of an unjustifiable standard, such as race, religion, or some other arbitrary factor, or to prevent the defendant from exercising a fundamental right. Id. The defendant bears the burden of proof, id., and must establish each of these elements with "clear evidence" sufficient to overcome the presumption of regularity that attaches to decisions to prosecute, United States v. Armstrong, 517 U.S. 456, 464 (1996). Pursuant to Rule 12 of the Federal Rules of Criminal Procedure, a motion alleging a defect in the institution of the prosecution must be raised before trial. FED. R.CRIM. P. 12(b)(3)(A).

Here, defendant did not establish by *clear evidence* that "the decision to prosecute was made on the basis of an unjustifiable standard, such as race, religion, or some other arbitrary factor, or to prevent the defendant from exercising a fundamental right." Schoolcraft, 879 F.2d at

68. Defendant's allegations only establish that four out of the ten individuals charged in state court were federally indicted. Those allegations alone do not meet the clear evidence standard necessary to establish a claim for selective prosecution.

Defendant's request for the grand jury minutes stems from his argument that he was selectively prosecuted. (ECF No. 250 at 8-9 ("Petitioner asserts that it was a violation of his [F]ourteenth Amendment rights to equal protection by selecting him and three other individuals to indict federally. Consequently before trial, petitioner requested for grand jury minutes to review through his counsel and was on several attempts denied.").) "'The required threshold to obtain discovery'" with respect to a selective prosecution claim is "'some evidence tending to show the existence of the essential elements of the defense, discriminatory effect and discriminatory intent.'" United States v. Taylor, 686 F.3d 182, 197 (3d Cir. 2012) (quoting United States v. Hedaithy, 392 F.3d 580, 605 (3d Cir. 2004)). As discussed above, defendant did not point to any evidence indicating he was prosecuted based upon an impermissible factor, or that he was entitled to the grand jury minutes prior to trial.[12] Defendant, therefore, failed to set forth sufficient allegations to show that he was entitled to the grand jury minutes in this case. Defendant's writ of coram nobis will be denied with respect to his arguments asserting selective prosecution and entitlement to grand jury minutes.

---

[12] To the extent defendant's argument is understood as a claim for ineffective assistance of counsel based upon Frick's failure to raise defendant's selective prosecution argument or entitlement to the grand jury minutes prior to trial, defendant did not point to any evidence indicating he was prosecuted based upon an impermissible factor. Under those circumstances, his claim for ineffective assistance of counsel would fail because he was not prejudiced by Frick's alleged deficiency in not raising those issues before the court.

Defendant in his reply also argues that he did not raise his claim with respect to the grand jury minutes in his § 2255 because Frick told him such a claim was improper for collateral review and that she filed a motion to obtain the grand jury minutes. To the extent this reasoning constitutes sound reasons for failing to earlier seek relief, defendant is not entitled to relief because he did not make sufficient allegations to show his underlying claim has merit.

**F. Due Process Violation**

Defendant argues his sentence was imposed in violation of the Due Process Clause of the Fifth Amendment to the United States Constitution. (ECF No. 250 at 22.) Defendant does not elaborate on this point. The court—without additional argument or evidence—cannot conclude based upon defendant's bare allegations that a fundamental error occurred entitling defendant to relief. Defendant's writ of coram nobis will be denied with respect to this argument.

**V. Conclusion**

For the reasons set forth herein, defendant's coram nobis petition (ECF No. 250) will be denied. An appropriate order will be issued.

BY THE COURT,

Dated: April 2, 2015

/s/ JOY FLOWERS CONTI
Joy Flowers Conti
Chief United States District Judge